J-S02031-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: D.A.H.H., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2529 EDA 2023 |

Appeal from the Decree Entered August 28, 2023
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  2023-A060

BEFORE:   LAZARUS, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED FEBRUARY 16, 2024**

C.H. ("Father") appeals from the decree entered in the Court of Common Pleas of Montgomery County Orphans' Court, which involuntarily terminated his parental rights to his minor child, D.A.H.H. ("the Child") (born in November of 2021), pursuant to Section 2511 of the Adoption Act.[1]  Father's appointed counsel, Sean E. Cullen, Esquire, has filed an ***Anders***[2] brief, along with a petition seeking to withdraw from representing Father on appeal.  After a

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 23 Pa.C.S.A. §§ 2101-2938.

[2] ***See Anders v. California***, 386 U.S. 738 (1967), and ***Commonwealth v. Santiago***, 602 Pa. 159, 978 A.2d 349 (2009). The ***Anders*** principles and process have been extended to appeals involving the termination of parental rights. ***See In re V.E.***, 611 A.2d 1267 (Pa.Super. 1992) (extending ***Anders*** briefing requirements to termination of parental rights appeals involving indigent parents represented by court-appointed counsel).

careful review, we affirm the orphans' court's decree and grant counsel's petition to withdraw.

The relevant facts and procedural history are as follows: The Montgomery County Office of Children and Youth ("the Agency") filed a dependency petition as to the Child. Therein, the Agency averred it had received two referrals regarding the Child in November of 2021. The first referral reported the voluntary termination of Mother's parental rights as to her eldest child, J.H., who was twenty-three months old.[3] The second referral reported Mother was unable to care for the Child while he was in the hospital.

After receiving these referrals, the Agency met with Mother while she was in the hospital and implemented a safety plan where Mother was to have no unsupervised contact with the Child. Upon discharge from the hospital, Mother and Child resided in the home of maternal grandmother. The case was referred to intensive services to assist Mother with her behavioral, parenting, and housing needs.

The Agency averred that, on December 7, 2021, Father was released from the Montgomery County Correctional Facility, and Father contacted the Agency to report his release. On December 10, 2021, the Agency met with Mother and Father, who were unmarried, as well as maternal grandmother.

---

[3] J.H. is the Child's half-sibling. The Agency was granted custody of J.H. due to his failure to thrive, as well as Mother's inability to obtain housing and complete mental health treatment. In September of 2021, Mother voluntarily terminated her parental rights as to J.H. and consented to his adoption.

The Agency implemented a second safety plan for the Child and stressed that Mother could not have unsupervised contact with the Child. On December 17, 2021, intensive services discovered the Child was living with C.J., who has a long history with the Agency.

The Agency averred that, on December 20, 2021, the Agency attempted to meet with Mother and Father; however, neither answered their phones. On December 27, 2021, the Agency attempted to meet with Mother and Father; however, Mother reported she was at a friend's house while Father reported he was at work. On January 3, 2022, Mother informed the Agency she was still staying with a friend; however, the Child was residing with maternal grandmother. On January 5, 2022, the Agency contacted Father, who expressed an interest in caring for the Child. He provided the name of C.J. as a possible resource for the Child; however, when the Agency contacted paternal aunt, she reported C.J. was previously denied as a resource. Paternal aunt reported she or another suitable paternal relative would care for the Child.

On January 5, 2022, the Agency contacted Father's probation officer, who reported that Father had been in prison for statutory sexual assault, and, therefore, he was required to complete sex offender treatment as part of his probation. On January 8, 2022, the Agency received a referral reporting that maternal grandmother had permitted an unknown male to take the Child. After an investigation, the Agency determined the Child was taken by one of

Mother's former paramours and placed in the care of C.J. The Agency contacted paternal aunt, who agreed to retrieve the Child from C.J., and a third safety plan was instituted for the Child. On January 18, 2022, paternal aunt reported she would be unable to care for the Child after February 11, 2022, and there were no other available resources for the Child. Thus, the Agency requested the Child be adjudicated dependent.

On January 31, 2022, the orphans' court appointed Sharon Jones Hofer, Esquire, as the guardian *ad litem* for the Child. On February 11, 2022, following a hearing, the orphans' court adjudicated the Child dependent, and following a dispositional hearing on February 18, 2022, the Child was placed in the foster home of W.J. and R.J., who adopted the Child's half-sibling, J.H. Following a permanency review hearing, on May 20, 2022, the orphans' court found the placement of the Child continued to be necessary and appropriate. The orphans' court noted Father had violated his probation, and he was again incarcerated in the Montgomery County Correctional Facility.[4] The orphans' court found Father had no compliance with the permanency plan.

_____

[4] Specifically, in its May 20, 2022, permanency review order, the orphans' court noted:
> On March 9, 2022, Montgomery County Adult Probation notified [the Agency] that Father had been arrested for making terroristic threats, violating probation, and a bench warrant was issued. On May 3, 2022, [the Agency] was informed that Father turned himself in, and on May 6, 2022, Father was transported to the Montgomery County Correctional Facility.

Orphans' Court Order, filed 5/20/22, at 2.

On September 16, 2022, December 19, 2022, and March 22, 2023, after hearings, the orphans' court entered permanency review orders holding the placement of the Child continued to be necessary and appropriate. The orphans' court noted minimal progress by Mother and Father toward alleviating the circumstances, which necessitated the original placement. In its permanency review orders, the orphans' court relevantly noted Father had been released from prison on August 10, 2022; however, Father had not visited the Child, and he had been unsuccessfully discharged from the Justice Works Parenting Program. Father did not obtain housing and provided no proof of employment. As of the March 22, 2023, permanency review hearing, there was an active bench warrant for Father's arrest, and Father's whereabouts were unknown.

On May 17, 2023, the Agency filed a petition to confirm consent to adoption by Mother.[5] On May 23, 2023, the Agency filed a petition for the involuntary termination of Father's parental rights under 23 Pa.C.S.A. §§ 2511(a)(1), (2), (8), and (b). On August 28, 2023, the orphans' court held a hearing regarding the involuntary termination of Father's parental rights to the Child. Father, who was present during the hearing, was represented by

---

[5] The orphans' court appointed counsel to assist Mother, and following a hearing in July of 2023, the orphans' court entered a final decree confirming Mother's voluntary termination of her parental rights to the Child and agreeing to the Child's adoption. Mother has not appealed from this final decree.

Attorney Cullen, and the eighteen-month-old Child's best and legal interests were represented by Attorney Hofer.[6]

At the hearing, Paige Smedley, an Agency caseworker, testified she was Mother's caseworker from April of 2020 to September of 2021 regarding her eldest child, J.H. N.T., 8/28/23, at 10. Further, from November of 2021 to September of 2022, she was the caseworker regarding the Child. *Id.* at 11. She confirmed referrals were made to the Agency in November of 2021 regarding Mother's ability to provide proper care to the Child, and three safety plans were implemented. *Id.* She noted the Child has been monitored by the Agency, as well as by maternal grandmother and then paternal aunt. *Id.* When paternal aunt communicated that she could no longer care for the Child,

_____

[6] Notably, during the termination hearing, the orphans' court extensively questioned Attorney Hofer to determine whether she could represent the dual interests of the Child. N.T., 8/28/23, at 70-72. Relevantly, Attorney Hofer noted she met with the Child, but due to the Child's young age, the Child was unable to articulate his preference; however, she discerned no conflict between the Child's best and legal interests. *See id.* The orphans' court found the Child's interests did not conflict, and accordingly, permitted Attorney Hofer, who was the previously appointed guardian *ad litem*, to represent the Child's best and legal interests during the termination hearing. *Id. See In re Adoption of K.M.G.*, 663 Pa. 53, 240 A.3d 1218, 1235-36 (2020) (holding the orphans' court must determine whether counsel can represent the dual interests before appointing an individual to serve as guardian *ad litem* and legal counsel for a child, and the appellate court reviews to ensure the orphans' court made the determination in the first instance); *In the Interest of H.H.N.*, 296 A.3d 1258 (Pa.Super. 2023) (holding where a child's legal and best interests do not diverge in termination proceeding the attorney-guardian *ad litem* representing the child's best interest can also fulfill the role of the attorney under 23 Pa.C.S.A. § 2313(a) to represent the child's legal interests).

he was placed with the current foster parents, W.J. and R.J., who adopted the Child's half-sibling. *Id.*

Ms. Smedley testified she met with Father while he was in prison, as well as after his release, along with mother and maternal grandmother, on December 10, 2021. *Id.* at 12. She noted that, during the December 10, 2021, meeting, Father provided paternal aunt as a possible resource for the Child. *Id.* at 13.

Ms. Smedley testified she contacted Father on January 20, 2022, to advise him that a dependency hearing was scheduled for the Child on February 11, 2022. *Id.* at 15. She informed Father what he needed "to do to be considered as a possible custodian of [the Child]." *Id.* Specifically, as was outlined in the family services plan, she advised him that, in order to keep custody of the Child, he needed to "obtain stable housing and income and provide the Agency with verification of both." *Id.* She testified Father appeared, albeit late, for the dependency hearing on February 11, 2022, and he was in the courtroom when the orphans' court found the Child to be dependent. *Id.* at 16-17. Ms. Smedley noted that, during the February 11, 2022, hearing, "paternity testing was ordered" because Father "denied being the father to [the Child]." *Id.* at 19. She indicated she attempted "a few times" to schedule paternity testing even after Father was incarcerated again on May 3, 2022. *Id.* However, Father did not cooperate with testing until

July of 2022, and on August 17, 2022, the Agency received verification that Father is the biological father of the Child. *Id.* at 19, 27.

Ms. Smedley testified Father was provided with notice that one of his goals was to complete the Justice Works Parenting Program; however, he "had very minimal compliance and was discharged due to the noncompliance." *Id.* at 17. Ms. Smedley further testified that, prior to Father's incarceration on May 3, 2022, she created a child visitation schedule for Father; however, Father did not attend any of the visits with the Child. *Id.* at 18. She noted that, after Father was released from prison on August 10, 2022, she scheduled two visits with the Child upon Father's request; however, Father failed to appear at the visits. *Id.* at 21. After the second missed visit, Father did not make any further attempts to visit the Child, and he "very rarely" asked about the Child. *Id.*

Ms. Smedley indicated that, during the time she was the caseworker, she is unaware of Father sending supplies, cards, or financial support for the Child. *Id.* at 22. She specifically testified Father never developed a bond or relationship with the Child, and Father did not visit the Child on any occasion while she was the caseworker. *Id.* She indicated he never demonstrated that he was available or capable of being a full-time caregiver to the Child. *Id.*

On cross-examination, Ms. Smedley confirmed the Child was placed with the foster family, as well as his half-sibling, on February 21, 2022. *Id.* at 23. To Ms. Smedley's knowledge, Father "has not had any visits with [the] Child

during the past eighteen months[.]" *Id.* She also confirmed that, during the time she was the caseworker, Father "very rarely" inquired about the Child's health, and he never asked to attend any doctor's appointments. *Id.*

Ms. Smedley testified that, on August 5, 2022, during Father's incarceration, she received a telephone call from the prison indicating that Father had been moved to the medical unit on August 4, 2022, due to "suicidal ideations." *Id.* at 24. She indicated that, on August 29, 2022, Father requested contact information for the Child's foster parents, and Ms. Smedley provided the foster parents' email address. *Id.* at 25. She has no indication that Father contacted the foster parents via email. *Id.* at 26.

Ms. Smedley confirmed that, as of the time of the termination hearing, Father was again in prison. *Id.* She indicated that, to her knowledge, Father made all court appearances in the instant matter; however, he often did so virtually. *Id.* at 30-31. She testified the foster home is a "safe, stable, and loving home" and "all of [the Child's] needs are being met[.]" *Id.* at 29. She indicated the Agency attempted to find a permanent resource for the Child from his paternal and maternal relatives; however, there were no acceptable resources located. *Id.* at 32.

Shiquita Scott testified she has been the ongoing caseworker for the Child since October of 2022, and Father has made no attempts to contact her. *Id.* at 34. She indicated that, during her time as the caseworker, Father has not scheduled any visitation with the Child. *Id.* Moreover, Father has not

provided any updates regarding the completion of his family service plan goals. *Id.*

Ms. Scott testified the Child is "doing very well" with his foster family, he is developmentally on target, and he has no special needs. *Id.* at 35. She testified he is "very bonded to the foster parents," who want to adopt the Child. *Id.* She recommended that Father's parental rights be involuntarily terminated so that the Child may be adopted. *Id.*

On cross-examination, Ms. Scott confirmed that Father was absent from the March 22, 2023, permanency review hearing, and there was an active bench warrant for Father's arrest at that time. *Id.* at 38. She confirmed the Child is doing well at the home of the foster family, the foster family "loves him," and "he loves them." *Id.*

Ms. Scott noted she reached out to Father in October of 2022, when she was assigned as the caseworker for the instant matter. *Id.* at 39. Specifically, she mailed notice that she had taken over the case, as well as a copy of the family service plan, to Father's last known address; however, Father never responded. *Id.* Accordingly, Ms. Scott contacted Father's probation officer, who indicated she did not have any new addresses or contact information for Father. *Id.* Ms. Scott remained in contact with Father's probation officer until March of 2023, at which time the probation officer advised Ms. Scott that there was a bench warrant issued for Father's arrest. *Id.* at 40. She specifically

testified she "had no contact with [Father]" while she was the caseworker. *Id.*

Susan Rhoads, an adoption caseworker with the Agency, testified she has been "working on the case since May [of 2023]." *Id.* at 41. On May 16, 2023, she reached out to Father, who was incarcerated, to determine whether he would sign a consent for adoption. *Id.* Father initially agreed that permitting the Child to remain with the foster parents, along with his half-brother, was in the Child's best interests; however, he later indicated he wanted to "get [the Child] back." *Id.* at 42. She noted Father provided him with a copy of a lease, and he indicated he would be living at the address on the lease after his release from prison in November of 2023. *Id.* at 43. She indicated Father did not ask for visits with the Child, and he offered no explanation as to why he did not visit the Child when he was not incarcerated. *Id.*

Father testified initially as on cross-examination. He indicated he was most recently incarcerated on April 22, 2023, when he surrendered to authorities. *Id.* at 46. He admitted he found out in late November of 2022 that there was a bench warrant issued for his arrest, but he waited until April 22, 2023, to surrender himself. *Id.* Father indicated his probation was revoked, and he "took a sentence of six months and twelve days[.]" *Id.* at 47. Father confirmed that, as of the time of the termination hearing, he was currently in prison. *Id.* His expected release date was November 6, 2023.

*Id.* He noted he was due in criminal court in Luzerne County on October 12, 2023, to address outstanding charges of fleeing and eluding. *Id.* As of the time of the instant hearing, the charges were still pending. *Id.*

Father admitted he was convicted of statutory sexual assault, and he was sentenced to serve two years to four years in prison. *Id.* at 53. Father indicated he was incarcerated for a violation of probation when the Child was born in early November of 2021, and he was released from prison approximately one month later. *Id.* at 49. Thereafter, a bench warrant was issued for his arrest, and he "became incarcerated [again on] May 3, 2022," and he was released on August 10, 2022. *Id.* However, he was "incarcerated [again]…on April 22, 2023," and he was still in prison as of the time of the termination hearing on August 28, 2023. *Id.* Father indicated "the last three times [he was] incarcerated…related to probation violations for an underlying offense from 2017 of statutory sexual assault[.]" *Id.* at 50.

Father indicated "[t]he last time [he] had contact with [the Child] was— actually, when [he was] in court was the last time [he] seen [*sic*] him and talked to him." *Id.* Father admitted that, since February 11, 2022, he has known the Child has been living with a foster family. *Id.* at 51. Father indicated the last time he saw the Child "in person" was before the Child was placed in foster care. *Id.* at 52. Father noted that, when he is released from prison, he plans to live with his fiancée and two stepsons. *Id.*

Father admitted he has no pictures of the Child. *Id.* at 54. He indicated he was given the email address for the Agency and the foster family; however, he never sent emails to them. *Id.* at 55. He further admitted he did not reach out to the Agency or the foster family via any other method, such as calling them. *Id.* Father testified he never went to any of the Child's doctor's visits. *Id.* He noted he "didn't even know [the Child] had doctor visits and stuff like that." *Id.* However, he then indicated he took the Child to doctor's visits from December of 2021 to January of 2022, when he was not in prison; however, he confirmed he hasn't taken the Child to any doctor's visits after January of 2022. *Id.* at 55-56.

Father admitted that, after the Agency became involved with the family in November of 2021, his goals included creating a budget, finding stable housing, participating in a nurturing parent program, and visiting the Child. *Id.* at 56. Father indicated that, aside from finding housing and getting a job, he did not meet his goals. *Id.* Father admitted he has been offered services to assist him in reaching his goals since the time of the Child's birth. *Id.* at 63. Father testified it is "hard" for him when he is in prison, and he has struggled with his mental stability. *Id.* at 56. He noted that, when he was out of prison, he needed to report to his place of employment. *Id.* Thus, his time was limited, and, consequently, he "couldn't visit [the Child]." *Id.* at 57. He indicated that, after he was released from prison in August of 2022, he moved to Ashland, PA, and then to Hazleton, PA, to find work. *Id.*

Father testified that, if his parental rights remain intact, he wants to "move slow" and began visits with the Child so that he can "get to know him." *Id.* at 58. Father testified he understands the Child is doing well in the foster home, and he is with his half-sibling. *Id.* Father indicated he "would never want to pull [the Child] from his [half-]brother, but [he] would like to be in [the Child's] life." *Id.* at 58-59.

Father admitted he delayed submitting to a paternity test regarding the Child; however, he indicated he was working "difficult hours" from February 11, 2022, to August of 2022. *Id.* at 60. He noted he also has another biological child, upon whom he needed to focus, and he was "mentally stressing." *Id.* He admitted that, after he was released from prison on August 10, 2022, he was supposed to visit the Child on August 11, 2022; however, he cancelled the visit because he had to work. *Id.* at 61. On August 29, 2022, Father told the caseworker he wanted to contact the Child's foster family; however, he never contacted them. *Id.* Father admitted the Child "deserves consistency and structure in his life." *Id.* at 63. Father also admitted the Child deserves "permanency," but he would like the permanency to be with the Child's paternal relatives. *Id.* He indicated it is a "good thing" the Child is in a home with his half-sibling. *Id.* at 64.

On direct examination, Father testified that, after he is released again from prison, he will still have a period of probation. *Id.* at 65. He has a job and home "lined up" for when he is released from prison, and he would like

custody of the Child. *Id.* Father testified that, if he is given custody of the Child, he will allow the Child to see his half-siblings. *Id.* He noted he wants to be a "dad" to the Child. *Id.*

At this point, the Agency offered into evidence a certified copy of Father's criminal record from Montgomery County. *Id.* at 67. The exhibit confirmed Father entered a guilty plea on January 5, 2017, to an F2, statutory sexual assault charge, and he was sentenced to two to fours years in prison, to be followed by two years of probation. *Id.*

Upon questioning by the orphans' court, Father admitted that, in April of 2023, he was charged with criminal offenses in Luzerne County, and the charges were still pending as of the time of the termination hearing. *Id.* at 68-69. However, Father indicated "the deal on the table is probation." *Id.* at 68.

At the conclusion of the hearing, the orphans' court entered its decree involuntarily terminating Father's parental rights under Subsections 2511(a)(1), (2), (8), and (b). Father filed a timely counseled notice of appeal, as well as a contemporaneous concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed a responsive opinion. Thereafter, on November 15, 2023, Father's counsel, Attorney Cullen, filed a petition to withdraw his representation, as well as an *Anders* brief.

On appeal, counsel raises the following issues on behalf of Father (verbatim):

1. Whether an application to withdraw as counsel should be granted where counsel has investigated the possible grounds for appeal and finds the appeal frivolous[?]

2. Whether the Honorable Court committed an error of law and/or abuse of discretion when it held that appellee had proven by "clear and convincing evidence" that appellant's parental rights should be terminated pursuant to 23 Pa.C.S. § 2511(a)(1) where birth father was making substantial progress on his Family service Plan(s) goals as evidenced by the testimony at the hearing and Family Service Plans themselves[?]

3. Whether the Honorable Court committed an error of law and/or abuse of discretion when it held that appellee had proven by "clear and convincing evidence" that appellant's parental rights should be terminated pursuant to 23 Pa.C.S. § 2511(a)(2) in that the repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for their physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent[?]

4. Whether the Honorable Court committed an error of law and/or abuse of discretion when it held that appellee had proven by "clear and convincing evidence" that appellant's parental rights should be terminated pursuant to 23 Pa.C.S. § 2511(a)(8) in that the Child had been removed from the care of a parent or guardian by the Court, 12 or more months have elapsed from the date of the removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the need and welfare of the child[?]

5. Whether the Honorable Court committed an error of law and/or abuse of discretion when it terminated Appellant's parental rights pursuant to 23 Pa.C.S. § 2511(b) on the basis that the developmental, physical, emotional and welfare of the child's was best served by termination of birth father's rights where he was making substantial progress on the Family Service Plans[?]

- 16 -

*Anders* Brief at 6.

Our standard of review is well-settled:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the [orphans'] court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the [orphans'] court's order only if we conclude that the [orphans'] court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The [orphans'] judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result. We are bound by the findings of the [orphans'] court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The [orphans'] court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the [orphans'] court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the [orphans'] court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citations omitted).

Before we begin our substantive analysis, we must address the petition to withdraw as counsel, which was filed by Father's counsel, Attorney Cullen. When counsel files an *Anders* brief, this Court may not review the merits without first addressing counsel's request to withdraw. *Commonwealth v. Washington*, 63 A.3d 797, 800 (Pa.Super. 2013). We review Attorney

- 17 -

Cullen's **Anders** brief for compliance with the requirements set forth by our Supreme Court in **Santiago**, **supra**.

[C]ounsel must:

(1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Santiago**, **supra**, 978 A.2d at 361.

Additionally, pursuant to **Commonwealth v. Millisock**, 873 A.2d 748 (Pa.Super. 2005), and its progeny, "[c]ounsel also must provide a copy of the **Anders** brief to his client." **Commonwealth v. Orellana**, 86 A.3d 877, 880 (Pa.Super. 2014). Counsel must attach to the brief a letter that advises the client of his right to: "(1) retain new counsel to pursue the appeal; (2) proceed *pro se* on appeal; or (3) raise any points that the appellant deems worthy of the court's attention in addition to the points raised by counsel in the **Anders** brief." **Id.** (internal quotation marks and citation omitted). "Once counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of the [orphans'] court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." **Commonwealth v. Goodwin**, 928 A.2d 287, 291 (Pa.Super. 2007) (*en banc*) (quotation omitted).

Here, Attorney Cullen filed a petition to withdraw, and, therein, he confirmed he sent Father a letter informing him of his right to obtain new counsel, or to proceed *pro se*, and explained that Father may raise any additional arguments with this Court. A copy of this letter is attached to the petition to withdraw.[7] **See** Petition to Withdraw, filed 11/15/23.

In his **Anders** brief, Attorney Cullen sets forth the relevant history of the case, as well as his reasons for concluding that Father's appeal is wholly frivolous. Attorney Cullen indicates in his petition that a copy of this brief was forwarded to Father. **See** Petition to Withdraw, filed 11/15/23. Accordingly, we conclude that Attorney Cullen has complied with the technical requirements of **Anders**, **Santiago**, and **Millisock**. We, therefore, proceed with our independent review of the record and the issues presented on Father's behalf.

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. The orphans' court must initially determine whether the conduct of the parent warrants termination under Subsection 2511(a). Only if the court determines that the petitioner established grounds for termination under Subsection 2511(a) does it then engage in assessing the petition under Subsection 2511(b), which involves a child's needs and welfare. **In re T.S.M.**, 620 Pa. 602, 71 A.3d 251,

_____

[7] We note Father did not file a brief with privately retained counsel or *pro se*.

267 (2013). To involuntarily terminate parental rights, the petitioner must prove grounds under both Subsections 2511(a) and (b) by clear and convincing evidence. *Id.*

Instantly, the orphans' court terminated Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with the orphans' court's findings under any one enumerated Subsection of 2511(a), as well as 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). After review, we conclude the record supports termination under Subsection 2511(a)(1), as well as Subsection 2511(b).

23 Pa.C.S.A. § 2511(a)(1) and (b) provide as follows:

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*\*\*

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b) (emphasis in original).

Regarding Subsection 2511(a)(1), our Supreme Court has held the following:

> [O]ur courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance, and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In re Adoption of L.A.K.*, ___ Pa. ___, 265 A.3d 580, 592 (2021) (internal citations and quotation marks omitted). Furthermore, "[f]ortitude is required, as a parent must act with 'reasonable firmness' to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities." *Id.* at 592 (citation omitted).

In assessing Subsection 2511(a)(1), the orphans' court should consider the entire history of the case and avoid applying the statutory six-month requirement mechanically. *See In re Adoption of C.M.*, ___ Pa. ___, 255 A.3d 343 (2021). However, the General Assembly's emphasis on the six months immediately preceding the filing of the termination petition indicates this timeframe is the "most critical period for evaluation" of a parent's conduct. *In re Adoption of L.A.K.*, *supra*, 265 A.3d at 592.

"[T]he question of whether a parent has failed or refused to perform parental duties must be analyzed in relation to the particular circumstances of the case." ***In re Burns***, 474 Pa. 615, 379 A.2d 535, 540 (1977).

> [Thus], even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months..., the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights].

***In re Adoption of L.A.K.***, ***supra***, 265 A.3d at 593 (quotation marks and quotation omitted).

The totality of the circumstances includes consideration of the following: "(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Subsection 2511(b)." ***Id.*** As explained by our Supreme Court, "the purpose of this analysis is to give effect to our mandate that courts avoid a mechanical application of the law regarding the termination of parental rights. The law must be applied with the purpose of serving needs and welfare of each individual child in his or her particular circumstances." ***Id.***

Moreover, with respect to Subsection 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. This Court reviews whether "termination of parental rights would best serve the

developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005) (citation omitted).

One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, "with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (PaSuper. 2018) (citation omitted). "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762–63 (Pa.Super. 2008). "In addition to a bond examination, the court can equally emphasize the safety needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs." *Id.* at 763. Moreover, the trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the adoptive resource. *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011). Ultimately, the concern is the needs and welfare of the child. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010).

In concluding the Agency proved the grounds for termination, by clear and convincing evidence, under Subsections 2511(a)(1) and (b), the orphans' court relevantly indicated the following on the record at the termination hearing:

> Under Subsection 2511(a)(1), termination of parental rights may occur where the [Agency] establishes that the parent, for a period of at least six months preceding the filing of the petition, has either evidenced a settled purpose of relinquishing a parental claim to the child or has refused or failed to perform parental duties.
>
> In this case, the evidence establishes that although the father, as acknowledged, had some obstacles and was incarcerated initially at the time of the Child's birth, then was released, and then was incarcerated again on May 3, 2022, until August 10, 2022, and then was incarcerated again in April of this year, and expects to remain incarcerated until November 6 of [2023], nevertheless, during significant periods of the Child's life, [Father] was not incarcerated. Nevertheless, he had no visits. He attended zero visits with [the Child] after he was adjudicated [dependent] and placed in foster care in February of 2022.
>
> [Father] also did not reach out to the [Agency] requesting visits, and [Father] delayed obtaining a [paternity] test, as ordered by the [orphans'] court, to confirm his parentage, and has given varying explanations of whether he always considered himself to be [the Child's] father or he did not consider that given that he did not have the results of the [paternity] test and the Agency did not have the results of the [paternity] test until August of 2022.
>
> Under any scenario, he certainly knew he was the father. He said he knew he was the father in this hearing in his testimony as of [the Child's] birth and in January and February of 2022. He certainly knew he was the father as of September of 2022, which is essentially eleven months ago. And in all of that time, he has not reached out to the [Agency] to find out how he can take a place of importance in [the Child's] life, how he can provide for [the Child's] emotional and physical needs, or how he can provide him with clothing, nutrition, food, and most important, visits and time.

Having had no visits with [the Child] since he was an infant in February of 2022, [Father] simply has refused and failed to perform parental duties with respect to [the Child] and has not formed a bond with [the Child] or formed a place of importance in [the Child's] life.

\*\*\*

All of the evidence establishes that there is no parental bond between [Father] and [the Child] because [the Child] has not seen [Father] since [the Child] was a very tiny infant in January or February of 2022, during the same period of time that [Father] was absent and not providing correct contact information to [the Agency], not meeting his goals under the family service plans, was discharged from the Justice Works program that was offered to him to help him [in] becoming a nurturing parent and understanding his parental obligations and roles, and he was discharged from that program unsuccessfully.

During all of this time, since February of 2022, [the Child] has been in a loving home with parents who are meeting his needs, in a home with his [biological, older, half-brother], and he has all of his emotional and physical needs for well-being and his developmental needs are being met. [The Child] is entitled to have a safe, nurturing, loving, and stable home and to have the security of knowing he will not be removed from that home.

\*\*\*

And the [orphans'] court also gives consideration under Subsection 2511(b) to the developmental, physical, and emotional needs and welfare of the Child, and determines that his needs will best be served by termination of [Father's] parental rights so he finds safety, security, and stability in a loving and nurturing home in which he has been raised since February of 2022.

N.T., 8/28/23, at 79-84.

We find no abuse of discretion or error of law. The orphans' court considered the totality of the circumstances and properly concluded that Father had refused or failed to perform his parental duties. *See* 23 Pa.C.S.A. § 2511(a)(1). Specifically, Father has abandoned his parental responsibilities

to the Child. Even when he was not in prison, Father failed to visit the Child or provide for any of the Child's needs. In fact, Father admitted he has not visited the Child since well before February of 2022, when the Child was deemed dependent and placed with a foster family. The orphans' court properly concluded Father failed to take any affirmative actions to develop and maintain a parent-child relationship. *See In re Adoption of L.A.K.*, *supra*.

Further, there is no bond between Father and the Child; however, the Child is well-bonded with the foster family where he lives with his half-sibling. Further, by all accounts, the Child is thriving with his foster family, and all of his developmental, physical, and emotional needs are being met. *See* 23 Pa.C.S.A. § 2511(b).

Finally, our review of the record does not reveal any non-frivolous issues overlooked by Attorney Cullen. After our independent review, we conclude that the evidence presented supports the orphans' court's decree involuntarily terminating Father's parental rights pursuant to Subsections 2511(a)(1) and (b). *See In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (absent abuse of discretion, error of law, or insufficient evidentiary support for the lower court's decision, decree in termination of parental rights proceeding must stand). Thus, we affirm the orphans' court's decree and grant Attorney Cullen's petition to withdraw his representation.

Decree affirmed. Petition to withdraw granted.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>2/16/2024</u>